UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

    Plaintiff,                                    Criminal No. 10-005 JNE/SRN

v.

David West Dixon (02),                **REPORT AND RECOMMENDATION**

    Defendant.

___

    Jeffrey Paulsen, Esq., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415 for Plaintiff.

    Lyonel Norris, Esq., Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, for Defendant.

___

SUSAN RICHARD NELSON, United States Magistrate Judge

    The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant Dixon's Motion to Suppress Evidence [Doc. No. 23], Motion to Suppress Evidence Obtained as a Result of Search and Seizure[1] [Doc. No. 25], and Motion to Suppress Statements, Admissions, and Answers [Doc. No. 26]. At the hearing, Defendant orally withdrew his Motion to Suppress Eyewitness Identifications [Doc. No. 24] because no identifications took place. This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.[2]

---

[1] The substance of this motion refers to a search of the premises at a certain address in Minneapolis. At the hearing the parties agreed that no search was conducted at that location relevant to this case. Defendant clarified that the motion is based on the search of the Chevy van associated with this investigation and not the Minneapolis residence.

[2] The Court has addressed Defendant's non-dispositive motions in a separate Order.

## I. BACKGROUND

The Government filed an Indictment against Defendant David West Dixon ("Dixon") on January 12, 2010, charging Defendant with Bank Robbery [Doc. No. 11]. This Court held a pre-trial motions hearing on February 24, 2010. Minneapolis Police Officer Dean Roth and FBI Special Agent Larry Wesbey testified on behalf of the Government. The Court received in evidence Government's Exhibit 1, an application, affidavit, search warrant, and receipt and inventory return for a 1997 Chevy van. This matter is set for trial before United States District Judge Joan N. Ericksen.

## II. FACTS

The following facts were elicited from the testimony and exhibit introduced at the hearing. Minneapolis Police Officer Dean Roth, an 18 year veteran with the department, was working on December 28, 2009, in a marked squad car. That morning, Officer Roth was called to the area of 18th Street and Nicollet Avenue in Minneapolis because of a report of a fight on the street between two males. When Officer Roth arrived in that area, he looked around but did not see anyone fighting in the street and he cleared the call with dispatch.

Officer Roth then proceeded south down Nicollet and took a right onto W 22nd Street. At approximately 10:04 a.m., Officer Roth was headed west on W 22nd Street near the intersection of 22nd Street and Blaisdell Avenue. Officer Roth's car was approximately one half block from the intersection when he observed a white male "frantically" running south on Blaisdell towards the intersection. At the southwest corner of the intersection, i.e. kitty-corner from Officer Roth's squad car, a light colored Chevy van sat stopped but running, approximately one car length before the stop sign. The white male, later identified as co-defendant Ryan Liskow, ran to the passenger's side of the vehicle and "dove" into the vehicle.

Officer Roth found the white male's behavior to be suspicious because of the manner in which the man was running and the way in which he got into the van. Officer Roth testified the man was running wildly "as if running away from someone or something" and he could barely stay on his feet. Officer Roth believed the male was possibly involved in the previous call he had received reporting two males fighting in the street. Therefore, he slowed down his squad car and watched the van. Officer Roth testified that he observed the van pull away from the curb and proceed through the intersection without stopping at the stop sign.

Because of the van's failure to stop at the stop sign, Officer Roth put on his flashers and angled his squad car to indicate the van should stop. The driver of the van, Defendant Dixon, stopped the vehicle and raised his hands. Officer Roth then indicated to dispatch that he had stopped a suspicious vehicle and provided dispatch with the van's license plate. At first, Officer Roth could only see the driver of the vehicle. As Officer Roth approached the van, the white male who previously "dove" into the car, "jumped" into view on the passenger side of the vehicle. Officer Roth raised his weapon to indicate the men should raise their hands, and the men complied.

After getting out of the squad car, Officer Roth was notified by dispatch that there was an alert on the van indicating it had recently been involved in an incident in Lakeville. The alert indicated that co-defendant Liskow was suspected of attempting to run over a relative with the vehicle and that the vehicle possibly contained two long guns. There was no indication in the alert that Defendant Dixon was involved in the Lakeville incident. Officer Roth then approached the driver's side of the vehicle and opened the van's door. Because both men were fidgeting, Officer Roth instructed the men to keep their hands on the dash and the officer kept his weapon pointed at the men. Defendant Dixon asked Officer Roth "what is going on?"

Once the van door was open, Officer Roth saw a large amount of cash in twenty dollar bills stuffed behind the driver's seat. Consequently, Officer Roth asked dispatch for an additional squad car and aired that he had seen a large amount of cash in the vehicle. A short time later, dispatch indicated that there had just been a bank robbery at the Franklin National Bank and the suspect was a white male.[3] The bank was a half block away in the direction from which the white male had run earlier.

Back-up arrived on the scene and Officer Roth indicated the other officer should remove the passenger from the vehicle. Officer Roth then instructed Defendant Dixon to get out of the car and onto the ground. Once Defendant Dixon was on the ground, Officer Roth holstered his gun and cuffed the defendant. At that time, Defendant Dixon was holding a ballpoint pen in his left hand, and Officer Roth took the pen and placed it on the driver's seat of the vehicle. Next, Officer Roth did a pat down search of Defendant Dixon and placed him under arrest for suspicion of bank robbery.

Sergeant Nelson, Officer Roth's shift supervisor, and Deputy Chief Robert Allen then arrived on the scene and directed Officer Roth to place Defendant Dixon in the back of his squad car. Ten to fifteen minutes after the incident occurred, Officer Roth was instructed to take Defendant Dixon to an investigation/interview room at the police station at City Hall. The van that Defendant Dixon was arrested in was towed to the Minneapolis forensic garage. A search warrant was obtained for the vehicle and cash was seized in the search.

At the police station, Lieutenant Michael Fossum and Sergeant Carpenter told Officer Roth to place Defendant Dixon in interview room 108. Before placing Mr. Dixon in the interview room, Officer Roth searched Defendant Dixon again more thoroughly. The search

---

[3] Defendant Dixon is African-American.

uncovered a small spiral note pad, another ballpoint pen, and other miscellaneous items. Later Officer Roth learned that the demand note used in the robbery was written on a piece of small spiral notebook paper.

Lieutenant Fossum and FBI Special Agent Larry Wesbey interrogated Defendant Dixon beginning at approximately 12:00 p.m., a couple of hours after Defendant Dixon was arrested. The interview, which was recorded, began with Lieutenant Fossum asking the defendant basic background questions, including his name, date of birth, address, and known associates. Lieutenant Fossum then read Defendant Dixon his Miranda rights. After reading each right, Lieutenant Fossum asked the defendant if he understood that right, and Defendant Dixon indicated he did. Lieutenant Fossum then asked if Defendant Dixon still wished to speak to the officers, and the defendant indicated he did. Defendant Dixon never asked for a lawyer nor asked to stop the interview. At some point in the interview, Agent Wesbey did tell Defendant Dixon that he should tell the truth and "things would go better for him."

Throughout the interview, Defendant Dixon seemed calm and appeared to understand the officers' questions. Agent Wesbey testified that the officers did not make any threats or promises to Defendant Dixon. In total, the interview lasted more than three hours. Agent Wesbey believes Defendant Dixon was offered water but could not recall if the officers ever offered Defendant Dixon food or the opportunity to use the restroom. Defendant Dixon, however, never indicated to the officers that he needed to use the restroom or needed food. For the majority of the interview, the defendant denied any involvement with the robbery. Near the end of the interview, however, the defendant made potentially incriminating statements.

### III. DISCUSSION

Defendant moves to suppress the evidence seized from the van and his person and to suppress the statements he made after his arrest. Defendant Dixon contends that the evidence in this case should be suppressed because the officers did not have reasonable suspicion to stop the van. Defendant also contends that his statements should be suppressed because the statements were involuntary. This Court disagrees and recommends that the motions be denied.

#### A. Officer Roth Had Reasonable Suspicion for the Traffic Stop.

Contrary to the defendant's arguments, the stop of the Chevy van was constitutional. The Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A traffic stop or investigatory detention constitutes a seizure within the meaning of the Fourth Amendment. United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004) (citing Delaware v. Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)). An investigatory detention, which is a brief seizure by police based on a reasonable suspicion of criminal activity, is a narrow exception to the Fourth Amendment's probable cause requirement. Terry v. Ohio, 392 U.S. 1, 26-27 (1968); United States v. Stigler, 574 F.3d 1008, 1010 (8th Cir. 2009). The officer must have a reasonable, articulable suspicion of criminal activity in order to conduct the investigatory detention, which has become known as a Terry stop. Id. at 21-22. The officer may also perform a limited pat-down search for weapons if the officer believes the person is armed and dangerous. Id. A reasonable, articulable suspicion means that there are specific and articulable facts, and rational inferences drawn from those facts, reasonably suggesting that criminal activity has occurred or is imminent. Id. at 21.

Any traffic violation, however minor, creates probable cause to stop a vehicle. United States v. Binion, 570 F.3d 1034, 1038 (8th Cir. 2009); United States v. Arciniega, 569 F.3d 394, 397 (8th Cir. 2009). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Arciniega, 569 F.3d at 397 (citing Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L.Ed.2d 89 (1996)). Once an officer has probable cause to stop a vehicle, "the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant." Id. (citing United States v. Bell, 86 F.3d 820, 822 (8th Cir. 1996)). Likewise, it is irrelevant that the officer may have ignored the violation if the officer did not suspect the possibility of a greater crime. Id. (citing United States v. Luna, 368 F.3d 876, 878 (8th Cir. 2004)).

In this case, Officer Roth stopped the van because it failed to stop at a stop sign in violation of Minn. Stat § 169.20. This traffic violation gave the officer reasonable suspicion to conduct a Terry stop of the vehicle. Even if Officer Roth's subjective intent was to stop the vehicle because of the unusual manner in which Liskow ran to the van, the traffic stop gave the officer an objective basis for the stop. Therefore, the motion to suppress the fruits of the initial stop should be denied.

### B. The Expansion of the Scope of the Stop Was Valid.

The expansion of the stop to wait for another squad car to arrive on the scene was not unconstitutional. An officer may expand the scope of a Terry stop if the officer has reasonable, articulable suspicion that the person is engaged in criminal activity. United States v. Binion, 570 F.3d 1034, 1039 (8th Cir. 2009); United States v. Gil, 513 F.3d 836, 844 (8th Cir. 2008); United States v. Long, 320 F.3d 795, 800 (8th Cir. 2003). To expand the scope of the stop, "[t]he officer must have a particularized and objective basis for suspecting the particular person stopped of

7

criminal activity." Binion, 570 F.3d at 1039 (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)). In such instances, the officer may then broaden the scope of the stop and satisfy his or her reasonable suspicions without violating the Fourth Amendment, including asking questions unrelated to the original traffic stop. Gil, 513 F.3d at 844; United States v. Hogan, 539 F.3d 916, 921 (8th Cir. 2008); United States v. Jones, 269 F.3d 919, 926-27 (8th Cir. 2001). Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances. Gil, 513 F.3d at 844; Binion, 570 F.3d at 1039; United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002).

During a Terry stop, officers may conduct protective searches for weapons, without probable cause, where the officer has an articulable suspicion that an individual is armed and dangerous. United States v. Shranklen, 315 F.3d 959, 961 (8th Cir. 2003) (citing Terry, 392 U.S. at 24). Because of the hazardous nature of roadside stops, the Supreme Court has held, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief . . . that the suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); see also Shranklen, 315 F.3d at 961; United States v. Patterson, 140 F.3d 767, 773 (8th Cir. 1998). Officers may also take steps "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop" including removing passengers from a vehicle. United States v. Walker, 555 F.3d 716, 721 (8th Cir. 2009) (citing United States v. Hensley, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985)).

After Officer Roth stopped the vehicle, he learned that there was an alert that the van had been involved in an incident in which the driver tried to run over another person and that the

8

vehicle possibly contained two long guns. Because of the violent nature of the crime alert and the possible involvement of guns, the alert provided Officer Roth with reasonable articulable suspicion to expand the scope of the Terry stop, including opening the car door to remove the defendant from the vehicle and secure officer safety. The motion to suppress the fruits of the expanded search should therefore be denied.

### C. The Searches of Defendant Dixon Were Constitutional.

In order to protect officer safety and preserve evidence, a law enforcement officer may conduct a full search of an arrestee and the area within the arrestee's immediate control in a search made incident to an arrest. United States v. Jones, 479 F.3d 975, 978 (8th Cir. 2007) (citing United States v. Hrasky, 453 F.3d 1099, 1100-01 (8th Cir. 200)); see also Chimel v. California, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969); United States v. Robinson, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973). The area within an arrestee's immediate control is the area from which he or she might gain possession of a weapon or destructible evidence. United States v. Lucas, 898 F.2d 606, 609 (8th Cir. 1990). A search incident to arrest must be contemporaneous with the arrest. Curd v. City Court of Judsonia, Arkansas, 141 F.3d 839, 842 (8th Cir. 1998).

Unlike a pat-down search during an investigatory detention, an officer conducting a search incident to arrest may search not only for contraband, but also evidence that might be concealed or destroyed. Id.; United States v. Jones, 479 F.3d 975, 978 (8th Cir. 2007); United States v. Hrasky, 453 F.3d 1099, 1104 (8th Cir. 2006). While the rationale for a search incident to arrest is officer safety and to preserve evidence, the officer need not have any reason to believe that the individual is actually armed or that evidence of the crime will be found on his person. United States v. Pratt, 355 F.3d 1119, 1121 (8th Cir. 2004). "It is the fact of arrest that

enables the officer to conduct a search, not a particularized suspicion as to the suspect's dangerousness." Id. A search of a person incident to arrest may take place at the scene of the arrest or when the arrestee arrives at the police station or place of detention. Curd, 141 F.3d at 843.

The dispatch call relating the robbery of the bank a block away, Liskow's running from the area of the robbery at the relevant time period, and the sight of large amounts of cash in plain view in the vehicle, gave Officer Roth probable cause to arrest the occupants of the van. Incident to that arrest, it was permissible for Officer Roth to search Defendant Dixon for weapons and evidence, both at the scene of the arrest and at the police station before the interrogation. As such, the motion to suppress the fruits of the search of Defendant's person should be denied.

### D. Any Inculpatory Statements Made by Defendant Dixon Were Not Involuntary.

Any potentially incriminating statements made by Defendant Dixon during the interrogation were not the product of police coercion. An inculpatory statement made by a defendant may be inadmissible if the defendant establishes that the statement was involuntary. Williams v. Norris, 576 F.3d 850, 868 (8th Cir. 2009). A statement is involuntary if the totality of the circumstances show that the defendant's will was overborne by coercive police tactics and pressure. Id.; United States v. Dehghani, 550 F.3d 716, 719 (8th Cir. 2008). However, an interrogation of a suspect always involves some pressure because the purpose of an interrogation is to elicit a confession. Dehghani, 550 F.3d at 720. As the Eighth Circuit has noted, "it is a rare case when a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of

Miranda." Williams, 576 F.3d at 868 (citing Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001)).

Courts may consider promises of leniency in assessing whether police conduct overbore the will of a defendant, but it is only one consideration "and does not render a confession involuntary per se." Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001). In Simmons, the Eighth Circuit stated that telling a suspect that telling the truth would "go better for him," did not "constitute an implied or express promise of leniency for the purpose of rendering his confession involuntary." Id. (citing Bolder v. Armontrout, 921 F.2d 1359, 1366 (8th Cir. 1990)). "A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will." Id.

In this case, Defendant Dixon suggests that the interrogation was coercive because it was excessively lengthy, lasting more than three hours. While a lengthy interrogation can be coercive, the Eighth Circuit has upheld interrogations lasting as long as thirteen hours. Williams, 576 F.3d at 868-69. Under the circumstances, the length of the interrogation does not compel the conclusion that the defendant's will was overborne. Nor was Agent Wesbey's statement, that it would "go better" for defendant if he told the truth, coercive. As set forth above, the Eighth Circuit has already held that such a statement is not a promise of leniency and does not render a confession involuntary. There is no evidence in the record to suggest that the officers made verbal or physical threats during the interrogation. Defendant Dixon was provided water and he appeared calm throughout the interrogation. While the agents may not have offered Defendant Dixon use of the restroom, there is no evidence suggesting he asked to use the restroom but was denied. Under the totality of the circumstances, Defendant Dixon's will was not overborne in

the interrogation and any incriminating statements he may have made were not involuntary. The motion to suppress statements should be denied.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence [Doc. No. 23] be **DENIED**;

2. Motion to Suppress Eyewitness Identifications [Doc. No. 24] be **WITHDRAWN**;

3. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 25] be **DENIED**; and

4. Defendant's Motion to Suppress Statements, Admissions, and Answers [Doc. No. 26] be **DENIED**.

Dated: March 8, 2010  s/ Susan Richard Nelson
Susan Richard Nelson
U. S. Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **March 23, 2010,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.